JOHN M. FACKLER, APPELLANT, *v.* JOHN R. FORD AND OTHERS.

The fourth and fifth sections of the act of Congress passed on the 31st of March, 1830, (4 Stat. at L., 392,) entitled "An act for the relief of purchasers of pub

lic lands, and for the suppression of fraudulent practices at the public sales of the United States," cited and explained.

One who covenants to sell lands which he expects to purchase at such sales, cannot afterwards plead his own fraud in obtaining his title from the Government in bar of a decree for specific performance of his agreement.

THIS was an appeal from the Supreme Court of the Territory of Kansas.

The facts of the case are stated in the opinion of the court.

It was argued by *Mr. Carlisle,* upon a brief filed by *Mr. Badger* and himself, for the appellant, and by *Mr. Ewing* and *Mr. Coombs* for the appellees.

The counsel for the appellant insisted that the agreement of November 23, 1856, was in violation of the fourth and fifth sections of the act of 31st March, 1830.

4 Stat. at L., 392.

We insist that the contract on which this bill is filed is in conflict with the provisions of both these sections, and tends immediately to defeat or obstruct the purpose of Congress. That purpose, in both sections, is to secure free and open contests at the sales of the public lands by auction. The fourth section prohibits any contract or agreement to induce or prevent any one from bidding at such sales. Here, the plain result and effect of this contract was to prevent the appellees from bidding for land which the contract shows that they desired to possess; and this was directly within the scope of the agreement and purpose of the parties. For how could it be consistent with the agreement, that the appellant should buy for himself and the other parties; that the other parties should bid against him—that is, against themselves? That they would not, was certain, because those other parties were by the agreement to pay to the appellant one moiety of the price at which the land should be bid off by him; and the agreement shows upon its face that it was well understood that the appellant would, as a settler on the land, buy it for the *min imum* price at which it was to be put up for sale; or, in other words, it was the expectation that there would in effect be no

auction and no bid but that of the appellant, if the appellees did not enter the contest. And the agreement to pay the appellant ten thousand. dollars beyond the price to be paid to the United States, shows that the land to be bought was known to be worth many times that price. It was therefore a plain, direct purpose of the contract to prevent the land from bringing a fair value, by stifling a contest, and excluding the only party besides the appellant desiring the land from bidding. And further, this understanding was so much a part of the contract, that the appellees could not have bid without violating the agreement on their part, and discharging the appellant from his part thereof. For to bid would have been to enhance the price, one-half of which the appellant was to pay, contrary to the obvious intent and purpose of the contract.

Now, all this is in plain contravention of the fourth section of the statute, which makes it an offence to bargain, contract, or agree with any person, that such person will not bid at any such sale, or even to attempt to make a bargain, contract, or agreement, for such purpose. Now, here was not only a contract, but an effectual one, by which the appellees were prevented from making a bid.

But further, the same section makes it an offence, by any "combination or unfair management," to hinder, or prevent, or attempt to hinder or prevent, any person from bidding; and though this primarily refers to the hindering of persons from bidding who are not parties to the combination or management, yet in this case, upon this contract, the combination or management with each other to procure the land at a less price, by preventing one of the parties, is seen to be within the mischief which the statute was intended to prevent; and whether the parties would or would not be indictable, yet the contract is in plain and evident conflict with the policy of the law, and therefore prohibited thereby.

But the contract is also manifestly a violation of the last cited section—the fifth of the statute.

That section prohibits any and every contract or secret understanding made by one or more persons with another who

*Fackler v. Ford et al.*

proposes to purchase any such lands, to pay or give to such purchaser for such land a sum of money or article of property over and "above the price at which the land may or shall be bid off," and declares every such contract, &c., and "every bond, obligation, or writing, of any kind whatsoever, founded upon or growing out of the same," to be utterly null and void, and authorizes any party to such contract, &c., who may pay any such sum of money, &c., to sue for and recover back the same. Now, the contract in this case, we submit, falls, both literally and in spirit and intent, within the prohibition of this section. First, as to its letter. The parties came to an understanding for what the statute prohibited, and then entered into a written contract, which is void. Secondly, the whole scope and intent of the contract is in violation of the spirit of the law, which is, to secure a fair competition at the public sales. And both sections seek to accomplish that purpose—the former, by punishing any attempt to prevent bidding; the latter, by avoiding contracts between the parties, by which one should buy and sell to another at an enhanced price. The object is one—to insure fair competition. This is sought by both sections; and the contract in our case embraces both the modes of evading the enactment and accomplishing the mischief against which the statute was directed. There is, first, the attempt, by a bargain well devised and successfully carried out, to prevent competition, and procure the land at less than its value, by making it the interest of one party not to bid; then, there is, to accomplish the same purpose, the stipulation by that party to pay a price additional to that offered to and received by the United States at the auction-sale, and the actual payment thereof to the other party.

Now, it seems sufficiently obvious, that if such a contract will be enforced in a court of justice, for either party against the other, the object of the statute will be defeated. True, one or both the parties might have been, perhaps, indicted under the first section before the time of limitation had expired, and true, also, that one of the parties might, and may now, recover against the other the sum paid in violation of the law; but that is not the full measure of aid which courts

of justice give in support of the law. The indictment may be barred by time; the recovery back of the money may be prevented by the statute of limitations; but courts act upon the principle of giving no relief to parties to an unlawful contract—one expressly forbidden by law, or growing out of or connected with one so forbidden, or which plainly violates the policy of the law—the end and object of the law—however such contracts may be framed or executed.

This case, we submit, falls within this principle, and the appellees are consequently not entitled to relief.

The counsel for the defendant contended, on the other hand, that the agreement was not in violation of either of these sections.

The fourth section was intended to protect the United States against combinations to prevent competition at the sales.

Now, this case does not come within the provisions of this fourth section; there is no such agreement as it contemplates, either alleged or proved. If that section stood alone, this would be simply a case where two or three men give two or three other men a sum of money, the latter of whom are to bid off two designated tracts of land for the common benefit, and divide the land equally between them.

2. But the contract does, we think, come within the fifth section of the same act, which was intended, not for the protection of the United States, but for the protection of the person who is made to pay a premium to another for bidding off land for him. It is to prevent the levying of black mail, by combinations of men, trespassers on the public lands, who assemble at the sales, and with rifle and revolver overawe honest bidders. It was intended for such cases. It is in these words:

"That if any person or persons shall, before or at the time of the public sale of any of the lands of the United States, enter into any contract, bargain, agreement, or secret understanding with any other person or persons, proposing to purchase such land, or pay or give such purchasers for such land a sum of money, or other article of property, over and above

*Fackler* v. *Ford et al.*

the price at which the land may or shall be bid off by such purchasers, every such contract, bargain, agreement, or secret understanding, and every bond, obligation, or writing of any kind whatsoever, founded upon or growing out of the same, shall be utterly null and void. And any person or persons being a party to such contract, bargain, agreement, or secret understanding, who shall or may pay to such purchasers any sum of money or other article of property, as aforesaid, over and above the purchase money of such land, may sue for and recover such excess from such purchasers in any court having jurisdiction of the same. And if the party aggrieved have no legal evidence of such contract, bargain, agreement, or secret understanding, or of the payment of the excess aforesaid, he may, by bill in equity, compel such purchaser to make discovery thereof; and if in such case the complainant shall ask for relief, the court in which the bill is pending may proceed to final decree between the parties to the same: Provided, every such suit, either in law or equity, shall be commenced within six years next after the sale of said land by the United States."

The person of whom illegal exaction is made is not an offending, but, in the language of the act, the "aggrieved" party. Courts of equity are opened to him; he may compel a disclosure by the offending party, and he may have a decree for "such excess" as he has been compelled to pay. He may not, as seems to be supposed on the other side, recover back the actual purchase money, but only the excess, having his remedy in equity, as a matter of course, for the title to his land also. The fact that he has been swindled in the purchase, does not at all deprive him of his right to the land purchased. If the complainants had paid but $560, the actual price at which the land was bid off, they would have been entitled to their half of the land, beyond all doubt or question. But they were illegally required to pay an "excess," or not get the land. They paid it; the act of Congress says they are "aggrieved," and have a right to recover it back in equity. The act which gives them equitable remedy, which they had not, cannot be construed to take away that which they already

had. It is not intended to aggrieve the person imposed on, but to redress his grievance.

Mr. Justice GRIER delivered the opinion of the court.

Ford and others are complainants in a bill for specific performance of a contract made by them with Fackler & Mills.

The bill charges that on and before the 22d of November, 1856, Fackler claimed, as actual-settler thereon, a fractional section of land containing sixty acres, and Mills the east half of a quarter section, containing eighty acres, in Leavenworth county, Kansas Territory, being parts of the land purchased by the Government of the United States of the Delaware Indians.

These lands had been appraised at eight dollars an acre, and advertised for sale pursuant to law. That prior to that date, Fackler & Mills surveyed and laid off said tracts of land so claimed and held by them, into blocks, lots, public grounds, streets, alleys, &c., for a town to be known as "Fackler's addition" to Leavenworth city; that they made a plat of it and divided the whole into eighty shares of six lots each, executing certificates, on the back of each of which they indorsed the lots assigned; that they also represented themselves to be owners of a ferry right from the south part of Fackler's addition to and including a landing on the opposite side of the Missouri river, and a lease of a fractional section in Platte county, in Missouri, containing thirty-four acres; that Fackler & Mills were anxious to sell and dispose of the undivided half of the ferry, together with an equal and divided half in lots of the 140 acres, being 40 shares, containing in the aggregate 240 lots; that on the 22d of November, 1856, they entered into covenant, under seal, to sell to complainant 40 shares, being one-half of 140 acres in Fackler's addition to Leavenworth city, which shares were divided and agreed to be the following lots, viz: 23, &c., &c., &c.; that the complainants have paid the sum of $10,000 as a consideration, and agreed to furnish one-half the purchase money to be paid at the Delaware sales; that Fackler & Mills agreed to make a quit-claim deed to the vendees when they have obtained a title for the lands, and as

part consideration of said payment, a deed for the undivided half of the ferry right and lease of grounds on the Missouri side should also be executed.

At the bottom of this agreement, of the same date, is a receipt by Fackler for $560, "being one-half of the appraised value of the lands described in the within contract, which we are to use in paying for the said lands at Delaware sales, held at Leavenworth this day."

The bill further charges that Fackler & Mills did obtain a title for said land, and now refuse to convey to complainant either the land or the moiety of the ferry right, and prays for a decree for specific performance.

The respondents demurred to this bill, and afterwards withdrew their demurrer and filed an answer. The answer admits the contract and receipt of the money, and purchase of the lands, but charges that the Government of the United States was trustee of the Delaware Indians of these lands, and that the act of the officers of the Government in fixing the value of the land, and in restricting the purchase thereof to settlers thereon, to such valuation, was a "fraud on the Indians," and that the plaintiffs were cognizant of such fraud; that the lands were appraised far below their true value; that respondents have not put the plat of their town on record; that therefore the description of the land is so vague and uncertain that a court cannot decree a specific performance; that a statute of Kansas requires all town plats to be recorded; that besides the money paid to the respondents, there was a parol representation made by complainants; that by their capital and influence they had built up other towns in the West, and would do the same with this if they could get a large interest at low rates; and that not having performed this part of their contract, respondent refused to make them a title; and lastly, the answer concludes with the following defence and apology:

"And this defendant says, that inasmuch as the plaintiffs have endeavored to avail themselves of a supposed technical legal advantage to aid them in a non-compliance with their contract, and have failed to comply with the same, defendant in turn claims that he is justified in charging, and does charge

and insist, that said contract was made before the relinquishment of the title of the Delaware Indians to said land, and in violation of the said treaty with said Indians; and that said agreement, settlement, survey, and *platte* of said land were each in violation thereof, and in vio ation of the laws of the United States, and in violation of the statutes of the Territory of Kansas, and in violation of the public policy of the United States, and void."

Afterwards, on motion of complainants, the court ordered to be expunged from the answer each one of the charges, a summary of which we have just given. This left in the answer nothing but an admission of the charges in complainants' bill.

A bill of exceptions (according to the practice of that court) was taken to this order of the court, and the case was then heard on the bill, answer, and exhibits, and a decree was entered for complainants, which was confirmed on appeal to the Supreme Court of the Territory.

The allegation that the United States defrauded the Indians, and that the lands were sold below their value, and consequently that Fackler, having got his title by a fraud, was bound to commit the further fraud of keeping the complainants' money and the land too, might well have been expunged from the answer as "*impertinent*" in every sense of the term. The plea of vagueness of description in the contract, and that defendant had not put his town plat on record before he got a title from the United States, partake largely of the same quality.

The plea that plaintiffs had not used their influence to bring emigrants and make improvements in the intended addition to the city, and thus add value to the land which the respondent would *not* convey to them, was surely *irrelevant*, if not impertinent; and finally, the sweeping charge in the conclusion of the answer, that the whole transaction was in violation of the treaty with the Indians, and in violation of the laws of the United States, and of the statutes of Kansas, does not indicate whether respondent intends to charge the complainants with fraud, or rely upon his own. It alleges no facts, and is fol-

*Fackler* v. *Ford et al.*

lowed by no proof. It is in fact a return to the demurrer to the bill, and as such has been argued in this court.

The question to be decided is, whether there is anything on the face of this contract which shows it to be void by any law of the United States. How the treaty or the laws of Kansas can affect it has not been shown, and need not be further noticed. It was time enough to record the plat of the intended city when the respondents had obtained a title, and so far as it concerned the complainants, they could not be in default till they got a title, and were offering their lots for sale. The enumeration of the lots in the contract was a mode of specifying how the land should be divided, and the plat of the intended town could be referred to for description and certainty just as any other private survey or draft.

The laws of the United States which it is alleged invalidate this contract, are the fourth and fifth sections of the act of Congress of 31st of March, 1830, entitled "An act for the *relief of purchasers of public lands*, and for the suppression of fraudulent practices at the public sales of the lands of the United States." These sections are in these words:

"Sec. 4. That if any person or persons shall, before or at the time of the public sale of any lands of the United States, bargain, contract, or agree, or attempt to bargain, contract, or agree, with any other person or persons, that the last-named person or persons shall not bid upon or purchase the land so offered for sale, or any parcel thereof, or shall by intimidation, combination, or unfair management, hinder or prevent, or attempt to hinder or prevent, any person or persons from bidding upon or purchasing any tract or tracts of land so offered for sale, every such offender, his, her, or their aiders and abettors, being thereof duly convicted, shall, for every such offence, be fined not exceeding one thousand dollars, or imprisoned not exceeding two years, or both, in the discretion of the court.

"Sec. 5. That if any person or persons shall, before or at the time of the public sale of any of the lands of the United States, enter into any contract, bargain, agreement, or secret understanding with any other person or persons, proposing to purchase such land, or pay or give such purchasers for such

land a sum of money, or other article of property, over and above the price at which the land may or shall be bid off by such purchasers; every such contract, bargain, agreement, or secret understanding, and every bond, obligation, or writing of any kind whatsoever, founded upon or growing out of the same, shall be utterly null and void. And any person or persons being a party to such contract, bargain, agreement, or secret understanding, who shall or may pay to such purchasers any sum of money or other article of property, as aforesaid, over and above the purchase money of such land, may sue for and recover *such excess* from such purchasers in any court having jurisdiction of the same. And if the *party aggrieved* have no legal evidence of such contract, bargain, agreement, or secret understanding, or of the payment of the excess aforesaid, he may, by bill in equity, compel such purchaser to make discovery thereof; and if in such case the complainant shall ask for relief, the court in which the bill is pending may proceed to final decree between the parties to the same: Provided, every such suit, either in law or equity, shall be commenced within six years next after the sale of said land by the United States."

The fourth section is intended to protect the Government and punish all persons who enter into combinations or conspiracies to prevent others from bidding at the sales, either by agreement not to do so, or by intimidation, threats, or violence.

There is nothing to be found on the face of this contract which can be construed as an agreement not to bid, or to hinder, intimidate, or prevent others from doing so.

The fifth section is evidently intended for the protection of those who propose to purchase lands at the public sales from the extortions of those who have formed the combinations made penal by the fourth section. The complainants stand in the character of the "*party aggrieved*" by the fraud, if there be any in the case. If Fackler had made his conveyance according to his contract, and the complainants were *now* seeking to recover back the ten thousand dollars paid to him, this section of the statute might have been invoked by them, on proof of such a combination, and that Fackler was a party to it, as he

now acknowledges. But it is no part of the policy of this section to encourage frauds by releasing the fraudulent party from the obligation of his contract. The allegation of the answer that the contract was in violation of the treaty with the Indians, and of the acts of Congress, may be a confession of the respondent's own fraud, but it can give no right to commit another.

The answer filed in this case is by Fackler alone; the record shows the agreement of counsel that the bill be dismissed as to Mills.

The court below were therefore right in decreeing a specific performance of the contract, but erred in that part of the decree which orders a conveyance of the *undivided moiety of the* 140 acres. The contract is for a specified and divided moiety of the land, and an undivided moiety of the ferry privilege, and that portion of the decree which orders a conveyance according to the contract is affirmed with costs, and record remitted, with instructions to the court below to reform their decree in accordance with this opinion.