# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

WALTER EDWARD BAGDASARIAN,
    *Defendant-Appellant.*

No. 09-50529

D.C. No.
3:09-CR-00083-H-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Marilyn L. Huff, District Judge, Presiding

Argued and Submitted
August 5, 2010—Pasadena, California

Filed July 19, 2011

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Reinhardt;
Partial Concurrence and Partial Dissent by Judge Wardlaw

## COUNSEL

Ezekiel E. Cortez (argued), San Diego, California, for the defendant-appellant.

Kyle W. Hoffman, Assistant United States Attorney (argued), Karen P. Hewitt, United States Attorney, and Bruce R. Castetter, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

## OPINION

REINHARDT, Circuit Judge:

The election of our first black President produced a campaign with vitriolic personal attacks and, ultimately, sentiments of national pride and good will. The latter was short-lived on the part of some, politicians and non-politicians alike, and the vitriol continued as President Obama's term of office commenced. To those familiar with American political history, none of this should have come as a surprise. Although

Justice Scalia writes that "[o]bservers of the past few national elections have expressed concern about the increase of character assassination . . . engaged in by political candidates and their supporters,"[1] mudslinging has long been a staple of U.S. presidential elections. Justice Scalia, though analyzing a current issue, uncharacteristically overlooked the experience of our Founding Fathers. In the country's first contested presidential election of 1800, supporters of Thomas Jefferson claimed that incumbent John Adams wanted to marry off his son to the daughter of King George III to create an American dynasty under British rule; Adams supporters called Jefferson "a mean-spirited, low-lived fellow, the son of a half-breed Indian squaw, sired by a Virginia mulatto father."[2] Abraham Lincoln was derided as an ape, ghoul, lunatic, and savage,[3] while Andrew Jackson was accused of adultery and murder,[4] and opponents of Grover Cleveland chanted slogans that he had fathered a child out-of-wedlock.[5] Still, the 2008 presidential election was unique in the combination of racial, religious, and ethnic bias that contributed to the extreme enmity expressed at various points during the campaign.[6] Much of

---

[1]*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 382 (1995) (Scalia, J., dissenting).

[2]Paul F. Boller, *Presidential Campaigns: From George Washington to George W. Bush* 11 (2004).

[3]*See* Bruce L. Felknor, *Dirty Politics* 27 (1966).

[4]*See* Paul S. Herrnson, *Congressional Elections: Campaigning at Home and in Washington* 160 (1995).

[5]*See id*. The Cleveland story at least may have been true. *See* Jean Kinney Williams, *Grover Cleveland* 26 (2003).

[6]*See, e.g.*, Eileen Sullivan, *Obama Faces More Personal Threats than Other Presidents-Elect*, Huffington Post (Nov. 14, 2008), http://www.huffingtonpost.com/2008/11/14/obama-faces-more-personal _n_144005.html; Dave McKinney et al., *A Plot Targeting Obama? 3 in Custody May Be Tied to Supremacists, Said to Talk of Stadium Shooting*, Chi. Sun-Times, Aug. 26, 2008, at 3.

Then-Senator Obama was the first presidential candidate in U.S. history for whom Secret Service protection was authorized before being nomi-

this bias was misinformed because although the presidential candidate was indeed black, he was neither, as some insisted, Muslim nor foreign born.[7]

Here, we review a district court's conviction under 18 U.S.C. § 879(a)(3), which makes it a felony to threaten to kill or do bodily harm to a major presidential candidate. The defendant Walter Bagdasarian, an especially unpleasant fellow, was found guilty on two counts of making the following statements on an online message board two weeks before the presidential election: (1) "Re: Obama fk the niggar, he will have a 50 cal in the head soon" and (2) "shoot the nig."[8]

---

nated for the presidency. *See* Nedra Pickler, *Racial Slur Triggers Early Protection for Obama: He Called on Secret Service to Monitor Big Crowds*, Grand Rapids Pr., May 4, 2007, at A3; Shamus Toomey, "A Lot to Do with Race": Durbin Says Obama Needs Secret Service in Part Because He's Black, Chi. Sun-Times, May 5, 2007, at 6.

[7]False accusations that a President is a member of an unpopular religious minority were prevalent in the 1930s. Wealthy critics of Franklin Delano Roosevelt and his policies referred to the New Deal as the Jew Deal, convinced that the President was a Jew named Rosenfeld who "had surrounded himself with Jews who made policy from a Jewish perspective for their own benefit," Hasia R. Diner, The Jews of the United States, 1654 to 2000, at 212-13 (2006); Peter Novick, *The Holocaust in American Life* 42 (2000).

Today, there are a great number of critics of President Obama who continue to believe that he is a Muslim and many who still refuse to accept the fact that he is a native born citizen. *See* Lauren Green, *Nearly 1 in 5 Americans Thinks Obama is a Muslim, Survey Shows*, FoxNews.com (Aug. 19, 2010), http://www.foxnews.com/politics/2010/08/19-nearly-americans-thinks-obama-muslim-survey-shows (reporting that survey found "those who say the president is a Muslim give him a negative job approval rating"); Brian Stelter, *On Television and Radio, Talk of Obama's Citizenship*, N.Y. Times: Media Decoder, July 24, 2009 (noting that "conspiracy theorists who have claimed for more than a year that President Obama is not a United States citizen have found receptive ears among some mainstream media figures in recent weeks," discussing some of America's most prominent media figures).

[8]The complete second statement appears in the next paragraph.

These statements are particularly repugnant because they directly encourage violence.[9] We nevertheless hold that neither of them constitutes an offense within the meaning of the threat statute under which Bagdasarian was convicted.

## I.  Background

On October 22, 2008, when Barack Obama's election was looking more and more likely, Bagdasarian, under the username "californiaradial," joined a "Yahoo! Finance — American International Group" message board, on which members of the public posted messages concerning financial matters, AIG, and other topics. At 1:15 am on the day that he joined, Bagdasarian posted the following statement on the message board: "Re: Obama fk the niggar, he will have a 50 cal in the head soon." About twenty minutes later, he posted another statement on the same message board: "shoot the nig country fkd for another 4 years+, what nig has done ANYTHING right???? long term???? never in history, except sambos." Bagdasarian also posted statements on the same message board that he had been extremely intoxicated at the time that he made the two earlier statements.[10] He repeated at trial that he had been drinking heavily on October 22. Another participant on the message board, John Base, a retired Air Force

---

[9]Neither statement is thereby deprived of constitutional protection, however, because urging others to commit violent acts "at some indefinite future time" does not satisfy the imminence requirement for incitement under the First Amendment. *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (holding that the imminence requirement under *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969), is not satisfied by constitutionally protected speech that "amount[s] to nothing more than advocacy of illegal action at some indefinite future time").

[10]In the twenty minutes between the time at which he posted the "Obama, fk the niggar" and the "shoot the nig" statements, Bagdasarian posted a message that concluded: "burp more VINOOOOOOOO." Several hours later, he replied to another person's message that he had reported Bagdasarian's statements to the authorities, "Listen up crybaby ole white boy, I was drunk."

officer, reported Bagdasarian's second statement regarding Obama to the Los Angeles Field Office of the United States Secret Service that same morning. Base told the Secret Service that an individual identified by the username "californiaradial" had made alarming statements directed at the presidential candidate. He also provided the Secret Service with the Internet address link to the "shoot the nig" message board posting.

A Secret Service agent located this posting and the "Obama fk the niggar" posting on the Yahoo! message board, and, a week later, Yahoo! provided the Secret Service with subscriber information for californiaradial@yahoo.com, registered in La Mesa, California. Yahoo! also provided the Secret Service with the Internet Protocol history for the "californiaradial" email account, which Service agents used to identify the IP address from which the "shoot the nig" and "Obama fk the niggar" statements were posted. This IP address led the Service agents to Bagdasarian's home in La Mesa.

A month after the two statements for which Bagdasarian was indicted were posted on the AIG message board, two agents visited and interviewed him and he admitted to posting the statements from his home computer. When asked, he also told the agents that he had weapons in his home. The agents found one weapon on a nearby shelf; Bagdasarian said he had other weapons in addition. Four days later, agents executed a federal search warrant at Bagdasarian's home and found six firearms, including a Remington model 700ML .50 caliber muzzle-loading rifle, as well as .50 caliber ammunition.

The agents also searched the hard drive of Bagdasarian's home computer and recovered an email sent on Election Day with the subject, "Re: And so it begins." The email's text stated, "Pistol??? Dude, Josh needs to get us one of these, just shoot the nigga's car and POOF!" The email provided a link to a webpage advertising a large caliber rifle. Another email that Bagdasarian sent the same day with the same subject

heading stated, "Pistol . . . plink plink plink Now when you use a 50 cal on a nigga car you get this." It included a link to a video of a propane tank, a pile of debris, and two junked cars being blown up. These email messages would appear to confirm the malevolent nature of the previous statements as well as Bagdasarian's own malignant nature. Unlike in the case of his first two message board statements two weeks earlier, this time he did not attempt to excuse his inexcusable conduct on the ground that he was intoxicated.

After the Secret Service filed a criminal complaint against Bagdasarian for the posting the "shoot the nig" and "Obama fk the niggar" statements, the Government filed the superseding indictment at issue here, charging Bagdasarian in two counts under 18 U.S.C. § 879(a)(3) with threatening to kill and inflict bodily harm upon a major candidate for the office of president of the United States. Bagdasarian waived his right to a jury trial. His case was tried before a district judge upon the foregoing stipulated facts. The district court found Bagdasarian guilty on both counts. He appeals.

## II. Analysis

**[1]** The federal statute under which Bagdasarian was indicted, 18 U.S.C. § 879(a)(3), makes it a crime to "knowingly and willfully threaten[ ] to kill, kidnap, or inflict bodily harm upon . . . a major candidate for the office of President or Vice President, or a member of the immediate family of such candidate." A statute like § 879, "which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind." *Watts v. United States*, 394 U.S. 705, 707 (1969). Although the State cannot criminalize constitutionally protected speech, the First Amendment does not immunize "true threats." *Id*. at 708. The Court held in *Virginia v. Black*, 538 U.S. 343 (2003), that under the First Amendment the State can punish threatening expression, but only if the "speaker means to communicate a serious expression of an intent to commit an act of unlawful

violence to a particular individual or group of individuals." *Id.* at 359. It is therefore not sufficient that objective observers would reasonably perceive such speech as a threat of injury or death.

**[2]** Because of comments made in some of our cases, we begin by clearing up the perceived confusion as to whether a subjective or objective analysis is required when examining whether a threat is criminal under various threat statutes and the First Amendment.[11] Such a choice reflects a false dichotomy. The issue is actually whether, as to a threat prosecuted under a particular threat statute, only a subjective analysis need be applied or whether both a subjective and an objective analysis is required. Whether we have held that a threat under a particular statute must be examined under an objective standard, as with 18 U.S.C. § 871(a),[12] which makes it unlawful to threaten the President, or whether we have held that the statute requires the application of both an objective and subjective standard, as with 18 U.S.C. § 879(a)(3),[13] the provision

---

[11]*See, e.g.*, *United States v. Stewart*, 420 F.3d 1007, 1018 (9th Cir. 2005) (discussing perceived inconsistency in circuit authority as to definition of constitutionally proscribable "true threat" before concluding that "we need not decide whether the objective or subjective 'true threat' definition should apply here . . . because the evidence establishes that [the defendant's] statement was a 'true threat' under either definition and thus is not protected by the First Amendment" (footnote omitted)); *United States v. Sutcliffe*, 505 F.3d 944, 961-62 (9th Cir. 2007) (citing *Stewart* for the proposition that "our . . . case law" is "contradictory" as to whether "an objective, rather than subjective, test [should be applied] to determine whether [the defendant's] statements constituted true threats[,]" but holding that "any error in the 'true threats' [jury] instruction was harmless" because "the district court instructed the jury that specific intent to threaten is an essential element of a § 875(c) conviction, and thus the jury necessarily found that Defendant had the subjective intent to threaten in convicting him of the offense").

[12]*See United States v. Romo*, 413 F.3d 1044, 1051 (9th Cir. 2005); *United States v. Lincoln*, 403 F.3d 703, 707 (9th Cir. 2005); *United States v. Hanna*, 293 F.3d 1080, 1083 (2002); *Roy v. United States*, 416 F.2d 874, 877 (9th Cir. 1969).

[13]*See United States v. Gordon*, 974 F.2d 1110, 1117 (9th Cir. 1992), *overruled on other grounds by Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058 (9th Cir. 2002) (en banc).

that we consider here, our analysis in its most important respect is ultimately the same: In order to affirm a conviction under any threat statute that criminalizes pure speech, we must find sufficient evidence that the speech at issue constitutes a "true threat," as defined in *Black*. Because the true threat requirement is imposed by the Constitution, the subjective test set forth in *Black* must be read into all threat statutes that criminalize pure speech. The difference is that with respect to some threat statutes, we require that the purported threat meet an objective standard *in addition*, and for some we do not.[14]

---

[14]Prior to *Black*, we did not always apply a subjective test when considering alleged violations of a threat statute. For example, although § 879 includes both an objective and subjective test, *see Gordon*, 974 F.2d at 1117, § 871 includes only an objective and no subjective test, *see Roy*, 416 F.2d at 877, even though both statutes require that threats be made "knowingly and willfully," §§ 871; 879, and even though we have specifically "look[ed] for guidance," in setting forth the statutory requirements of § 879, to *Roy*'s interpretation of the "closely analogous" § 871. *Gordon*, 974 F.2d at 1117.

It appears that we tried in *Roy* to impose a lower burden for conviction under § 871, which applies to threats against a sitting President, because "[a] President's death in office has worldwide repercussions and affects the security and future of the entire nation . . . regardless of whether the person making the threat actually intends to assault the President . . . ." *Roy*, 416 F.2d at 877 (citation omitted). Although in *Roy*, we sought to make it easier to punish threats against a President under § 871, the adoption of an objective standard serves the opposite function after *Black*. Because *Black* requires that the subjective test must be met under the First Amendment whether or not the statute requires it, an objective test is not an alternative but an additional requirement over-and-above the subjective standard.

To the extent that we may have suggested otherwise in a footnote in *Romo*, 413 F.3d at 1051 n.6 (declining, based on pre-*Black* precedent, to apply a subjective intent test under § 871(a) "because [the defendant] has not raised First Amendment issues), such analysis would be inconsistent with *Black* and must be limited to cases in which the defendant challenges compliance only with the objective part of the test and does not contend either that the subjective requirement has not been met, or that the statute has been applied in a manner that is contrary to the Constitution. In all other circumstances in which pure speech is prosecuted under a threat stat-

As we explained in *United States v. Cassel*, 408 F.3d 622 (9th Cir. 2005), although the "vagaries of our own case law," *id.* at 630, made it less than "entirely clear or consistent," "whether intent to threaten is a necessary part of a constitutionally punishable threat," *id.* at 628, *Black* "affirmed our own dictum — not always adhered to in our cases — that 'the element of intent [is] the determinative factor separating protected expression from unprotected criminal behavior." *Id.* at 632 (alteration in original) (quoting *United States v. Gilbert*, 813 F.2d 1523, 1529 (9th Cir. 1987)). *Cassel* made clear that *Black*'s "definition of a constitutionally proscribable threat is . . . binding on us even though it is in tension with some of the holdings and language in prior cases of this circuit." *Id.* at 633 (citation omitted).[15]

Because § 879(a)(3), the provision at issue here, requires subjective intent as a matter of statutory construction, *see Gordon*, 974 F.2d at 1117, it necessarily incorporates the constitutional inquiry commanded by *Black*: Did the speaker subjectively intend the speech as a threat? In order to "determine

ute, we cannot apply exclusively an objective standard, and any subjective test must incorporate the constitutional requirement set forth in *Black*. 538 U.S. at 359.

Because the statements at issue in the case before us fail to pass either of the two tests, we see no reason here to consider the question whether to retain an objective test for presidential threat statutes in view of *Black*. To be clear, we are not suggesting that an objective determination does not provide a worthwhile test or that statutes criminalizing threats against the President or others should require only a subjective test. We merely point out a paradox in our treatment of threat statutes now that *Black* requires proof of intent under the First Amendment in all such cases.

[15]In a footnote to the passage just quoted, *Cassel* distinguished *United States v. Lincoln*, 403 F.3d 703, 706 (9th Cir. 2005), which relied on pre-*Black* cases to suggest in dicta that the First Amendment requires application of an objective rather than a subjective test. *Cassel*, 408 F.3d at 633 n .9. *Cassel* pointed out that *Lincoln* "did not raise or consider the implications of *Virginia v. Black*," and therefore, in effect, that *Lincoln* must be treated simply as a pre-*Black* case. *Id.*

whether the verdict [under the statutory elements] is supported by sufficient evidence," we must answer the question "whether the facts as found by the jury establish the core constitutional fact of a 'true threat.' " *Stewart*, 420 F.3d at 1015. Our subjective intent analysis under § 879(a)(3) therefore subsumes the subjective intent-based true threat inquiry as described in *Black*.

## A. Elements of the Offense

Two elements must be met for a statement to constitute an offense under 18 U.S.C. § 879(a)(3): objective and subjective. The first is that the statement would be understood by people hearing or reading it in context as a serious expression of an intent to kill or injure a major candidate for President. *See Gordon*, 974 F.2d at 1117. The second is that the defendant intended that the statement be understood as a threat. *Id.* Because Bagdasarian's conviction under § 879 can be upheld only if both the objective and subjective requirements are met, neither standard is the obvious starting point for our analysis, and our resolution of either issue may serve as an alternate holding.[16]

### 1. Objective Understanding

[3] We begin with the objective test. One question under § 879(a)(3) is whether a reasonable person who heard the statement would have interpreted it as a threat. *Gordon*, 974 F.2d at 1117. This objective test requires the fact-finder to "look[ ] at the entire factual context of [the] statements including: the surrounding events, the listeners' reaction, and whether the words are conditional." *Id.* It is necessary, then, to determine whether Bagdasarian's statements, considered in their full context, "would be interpreted by those to whom the

---

[16]*See Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949) ("[W]here a decision rests on two or more grounds, none can be relegated to the category of obiter dictum.").

maker communicates the statement as a serious expression of an intention to inflict bodily harm on or to take the life of [Obama]." *Id.* (quoting *Roy*, 416 F.2d at 877-78). The evidence is not sufficient to support a conclusion that a reasonable person who read the postings within or without the relevant context would have understood either to mean that Bagdasarian threatened to injure or kill the Presidential candidate.[17]

**[4]** Neither statement constitutes a threat in the ordinary meaning of the word: "an expression of an intention to inflict . . . injury . . . on another." *Webster's Third New International Dictionary* 2382 (1976). The "Obama fk the niggar" statement is a prediction that Obama "will have a 50 cal in the head soon." It conveys no explicit or implicit threat on the part of Bagdasarian that he himself will kill or injure Obama. Nor does the second statement impart a threat. "[S]hoot the nig" is instead an imperative intended to encourage others to take violent action, if not simply an expression of rage or frustration. The threat statute, however, does not criminalize predictions or exhortations to others to injure or kill the President.[18]

---

[17]In *Planned Parenthood*, we applied a standard of review close to de novo to the question whether pure speech constitutes a "true threat" unprotected by the First Amendment. 290 F.3d at 1070. Here, both parties briefed and argued the case on the basis of the sufficiency-of-the-evidence standard of *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). For that reason, and because we would decide this case the same way under either *Planned Parenthood* or *Jackson*, we do not determine what standard of review applies here or in any future case.

[18]The Fourth Circuit has written that "an essential element of guilt [under § 871, which punishes threats against the President or successors to the presidency] is a present intention either to injure . . . or to incite others to injure," but added that "[m]uch of what we say here is dicta." *United States v. Patillo*, 438 F.2d 13, 16 (4th Cir. 1971) (en banc). No other circuit has concluded that incitement can be punished under a threat statute, and over forty years ago, in a case since cited approvingly in almost every presidential threat case in our circuit, we expressed doubt that § 871 makes criminal an intention or tendency to encourage others to injure the President. *Roy*, 416 F.2d at 877. We explained that "if Congress desired

It is difficult to see how a rational trier of fact could reasonably have found that either statement, on its face or taken in context, expresses a threat against Obama by Bagdasarian.[19]

There is no disputing that neither of Bagdasarian's statements was conditional and that both were alarming and dangerous. The first statement, which referred to Obama as a "niggar" who "will have a 50 cal in the head soon," coupled a racial slur with an assassination forecast during a highly controversial campaign that would ultimately make Obama

---

to prevent incitement of others to assault the President, then it could have limited the statute to make it a crime to incite or induce others to assault or attempt to assault the President." *Id.* Having previously "look[ed] for guidance," in construing § 879, to Roy's interpretation of the "closely analogous" § 871, *Gordon*, 974 F.2d at 1117, we here follow *Roy* in refusing to find that incitement qualifies as an offense under § 879. We also reach that conclusion independently on the basis of the plain language of the statute. *See* 18 U.S.C. § 879(a)(3) (making it a crime to "knowingly and willfully threaten[ ] to kill, kidnap, or inflict bodily harm upon . . . a major candidate for the office of President."); *see also supra* at 9803 n.9 (discussing imminence requirement for incitement under the First Amendment).

[19]The dissent's interpretation of Bagdasarian's statements as threats can be traced to its misplaced reliance on three cases. *See* Dissent at 9826-27. *Hanna*, which was decided before *Black*, reversed the threat conviction and remanded for a new trial, noting that if the defendant were "convicted again based on admissible evidence, he w[ould] be entitled to have the appellate court independently review the record to ensure that the surrounding facts found by the jury establish the constitutional fact of a true threat." 293 F.3d at 1088. *Planned Parenthood*, also decided before *Black*, is readily distinguishable on the law and the facts: There can be no question that the anti-abortionist group "was aware that a 'wanted'-type poster would likely be interpreted as a serious threat of death or bodily harm by a doctor in the reproductive health services community who was identified on one, given the previous pattern of 'WANTED' posters identifying a specific physician followed by that physician's murder." 290 F.3d at 1063. The facts here present no such pattern. Finally, *Romo* declined altogether to address whether the defendant's speech constituted a true threat under § 871(a) because he "has not raised First Amendment issues." 413 F.3d at 1051 n.6.

the country's first black president. No less troubling is the defendant's second statement imploring others to "shoot the nig," lest the "country [be] fkd for another 4 years+" because "never in history" has a black person "done ANYTHING right." There are many unstable individuals in this nation to whom assault weapons and other firearms are readily available, some of whom might believe that they were doing the nation a service were they to follow Bagdasarian's commandment. There is nevertheless insufficient evidence that either statement constituted a threat or would be construed by a reasonable person as a genuine threat by Bagdasarian against Obama.

**[5]** When our law punishes words, we must examine the surrounding circumstances to discern the significance of those words' utterance, but must not distort or embellish their plain meaning so that the law may reach them. Here, the meaning of the words is absolutely plain. They do not constitute a threat and do not fall within the offense punished by the statute. In *Watts*, the Supreme Court reversed a conviction under a presidential threat statute. 394 U.S. at 705-06. The defendant there had said, "[a]nd now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Id.* at 706. The Court held that "we must interpret the language Congress chose 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials' "; adding that "[t]he language of the political arena . . . is often vituperative, abusive, and inexact." *Id.* at 708 (citations omitted).

The Government argues that among the relevant elements of the factual context is that the defendant's messages were anonymous, posted only under the screen name "californ-

iaradial." We grant that in some circumstances a speaker's anonymity could influence a listener's perception of danger. But the Government offers no support for its contention that the imperative "shoot the nig" or the prediction that Obama "will have a 50 cal in the head soon" would be more rather than less likely to be regarded as a threat under circumstances in which the speaker's identity is unknown.[20] Whatever the effect, in other circumstances, of anonymity on a reasonable interpretation of Bagdasarian's statements, the financial message board to which he posted them is a non-violent discussion forum that would tend to blunt any perception that statements made there were serious expressions of intended violence.

[6] When, in this case, we look to "[c]ontextual information . . . that [could] have a bearing on whether [Bagdasarian's] statements might reasonably be interpreted as a threat," *United States v. Parr*, 545 F.3d 491, 502 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 1984 (2009), the only possible evidence is that three or four discussion board members wrote that they planned to alert authorities to the "shoot the nig" posting,

---

[20]In some circumstances, anonymity may generate greater concern because listeners cannot rely on the speaker's identity to discount any serious intentions. *Cf. Doe ex rel. Doe v. Kamehameha Schs./Bernice Pauahi Bishop Estate*, 625 F.3d 1182, 1190 (9th Cir. 2010) (Reinhardt, J., joined by Kozinski, C.J., dissenting from denial of rehearing en banc) (rejecting the propositions that "plaintiffs may be unreasonable in fearing severe threats of physical retaliation because they are made via the internet" or that "litigants do not reasonably fear threats of serious harm when they are made by unidentified people, some of whom may not intend to carry them out"). In other circumstances, however, listeners may give less credence to anonymous statements because they cannot identify any association between the speaker and a group that engages in violence, or otherwise ascertain that the speaker is an individual whose threat should be taken seriously. Whether a particular speaker's threat would be taken more or less seriously if made anonymously may depend on who that speaker is. Still, all threats against the President or a major presidential candidate must be taken seriously until it is established that there is no reason to do so.

although only one reader, Air Force Officer Base, actually did. The dissent identifies the responsive postings as the "[m]ost telling" evidence that a reasonable person would have perceived Bagdasarian's messages as a threat. In doing so, it mischaracterizes these postings as "indicat[ing] that [their authors] perceived 'shoot the nig' as a threat to candidate Obama." Dissent at 9828. In fact, none of the responses said anything about a threat. Their authors may well have thought that Bagdasarian's messages were impermissible or offensive for some other reason or that they encouraged racism or violence. We fail to see why the fact that several people had negative reactions to the messages should be taken to mean that they or others interpreted them as a threat. It is certainly more significant that among the numerous persons who read Bagdasarian's messages, the record reveals only one who was sufficiently disturbed to actually notify the authorities.[21]

[7] The Government contends that two additional facts show that Bagdasarian's statements might reasonably be interpreted as a threat. The first is that when Bagdasarian made the statement that Obama "will have a 50 cal in the head soon," Bagdasarian actually had .50 caliber weapons and ammunition in his home. The second is that on Election Day, two weeks after posting the messages, he sent an email that read, "Pistol . . . plink plink plink Now when you use a 50 cal

---

[21]The Stipulated Facts indicate only that Base "saw the 'shoot the nig' message," that he "was concerned that the posting threatened harm to Barack Obama," and that he "telephoned the Los Angeles Field Office of the United States Secret Service and reported the 'shoot the nig' posting." The Record does not contain evidence as to whether Base posted a response to the message board. Even under *Jackson v. Virginia*, 443 U.S. 307 (1979), the facts are insufficient to support a verdict that Bagdasarian threatened to kill Obama. The "critical inquiry" in *Jackson* "is whether the record evidence," when viewed by any rational trier of fact in the light most favorable to the prosecution, "could reasonably support *a finding of guilt beyond a reasonable doubt*." *Id.* at 318-19 (emphasis added). Here, the record is far too thin to support such a conclusion. *See also* 9810 n.17 (noting that in *Planned Parenthood*, we applied a standard of review close to de novo).

on a nigga car you get this," and linked to a video of debris and two junked cars being blown up. Nobody who read the message board postings, however, knew that he had a .50 caliber gun or that he would send the later emails. Neither of these facts could therefore, under an *objective* test, "have a bearing on whether [Bagdasarian's] statements might reasonably be interpreted as a threat" by a reasonable person in the position of those who saw his postings on the AIG discussion board. *Parr*, 545 F.3d at 502.

## 2. Subjective Intent

Even if "shoot the nig" or "[he] will have a 50 cal in the head soon" could reasonably have been perceived by objective observers as threats within the factual context, this alone would not have been enough to convict Bagdasarian under 18 U.S.C. § 879(a)(3). The Government must also show that he made the statements intending that they be taken as a threat. A statement that the speaker does not intend as a threat is afforded constitutional protection and cannot be held criminal. In *Black*, the Court explained that the State may punish only those threats in which the "speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." 538 U.S. at 359. And in *Gordon*, we held as a matter of statutory interpretation that Congress "construe[d] 'knowingly and willfully' [in § 879] as requiring proof of a subjective intent to make a threat,' " and thus requires the application of a subjective as well as an objective test. 974 F.2d at 1117 (alterations in original) (quoting 128 Cong. Rec. 21,218 (1982)).

**[8]** We have explained, *supra* at 9809-13, why neither of Bagdasarian's statements on its face constitutes a true threat unprotected by the First Amendment. Most significantly, one is predictive in nature and the other exhortatory. For the same reasons, the evidence is not sufficient for any reasonable finder of fact to have concluded beyond a reasonable doubt that Bagdasarian intended that his statements be taken as

threats. *See Jackson*, 433 U.S. at 319. Both under the constitutional requirement established in *Black* that we must read into § 879, and under the statutory requirement that we found extant in *Gordon*, the district court's inference of Bagdasarian's intent to threaten is unreasonable taken in context and does not, even when considered in the light most favorable to the prosecution, lie within the permissible range of interpretations of his message board postings. As a matter of law, neither statement may be held to constitute a "true threat."

As we discussed in the previous section, the prediction that Obama "will have a 50 cal in the head soon" is not a threat on its face because it does not convey the notion that Bagdasarian himself had plans to fulfill the prediction that Obama would be killed, either now or in the future. Neither does the "shoot the nig" statement reflect the defendant's intent to threaten that he himself will kill or injure Obama. Rather, "shoot the nig" expresses the imperative that some unknown third party should take violent action. The statement makes no reference to Bagdasarian himself and so, like the first statement, cannot reasonably be taken to express his intent to shoot Obama.[22]

As with our analysis of the objective test, we do not confine our examination of subjective intent to the defendant's statements alone. Relying on *United States v. Sutcliffe*, 505 F.3d 944 (9th Cir. 2007), the Government points to the two facts

---

[22]We are aware that an Internet radio host was recently convicted by a federal jury under 18 U.S.C. § 115(a)(1)(B), which punishes threats against, *inter alia*, a federal judge with intent to intimidate or retaliate. He was convicted for statements made regarding three Seventh Circuit judges who had issued a ruling that he disagreed with. *See United States v. Turner*, 1:09-cr-00650-DEW-JMA (E.D.N.Y. Aug. 13, 2010); Mark Fass, *Blogger Found Guilty of Threatening Judges in Third Federal Trial*, N.Y. L.J., Aug. 16, 2010, at 1. That case has not reached the appellate courts and thus does not affect our analysis here. It would in any event not cause us to change our view with respect to the constitutional question answered by *Black* or the result that we reach in this case.

that we discussed in our analysis of objective understanding as evidence that Bagdasarian intended to make a threat: (1) that he was later found to possess a .50 caliber gun like the one he mentioned in the "Obama fk the niggar" posting, and (2) that the Election Day email referred to the use of "a 50 cal on a nigga car." Neither fact is sufficient to prove beyond a reasonable doubt that Bagdasarian intended to make a threat when, two weeks before Election Day, he posted the two statements for which he was indicted.

In *Sutcliffe*, we affirmed a conviction under another threat statute, 18 U.S.C. § 875(c), which, in addition to the knowing transmission of an interstate threat, requires specific intent to threaten. 505 F.3d at 952, 960-61; *see also United States v. Twine*, 853 F.2d 676, 680 (9th Cir. 1988). We held that the district court did not abuse its discretion by allowing the Government to present evidence of the defendant's gun possession to demonstrate that he actually intended to threaten violence. *Id*. at 959. The fact of the defendant's gun possession was not determinative of the defendant's intent, however, but just one among many pieces of evidence relevant to the language and context of the threats that we considered in determining that the defendant had the requisite specific intent to threaten. Most important in *Sutcliffe* were the first-person and highly specific character of messages such as "I will kill you," "I'm now armed," and "You think seeing [your license plate number posted on my website] is bad . . . trust us when we say [it] can get much, much, worse. . . . [I]f you call this house again . . . , I will personally send you back to the hell from where you came." *Id*. at 951-52 (first omission and second alteration in original).

Given that Bagdasarian's statements, "Re: Obama fk the niggar, he will have a 50 cal in the head soon" and "shoot the nig" fail to express any intent on his part to take any action, the fact that he possessed the weapons is not sufficient to establish that he intended to threaten Obama himself. Similarly, the Election Day emails do little to advance the prosecu-

tion's case. They simply provide additional information — weblinks to a video of debris and two junked cars being blown up and to an advertisement for assault rifles available for purchase online — that Bagdasarian may have believed would tend to encourage the email's recipient to take violent action against Obama. But, as we have explained, incitement to kill or injure a presidential candidate does not qualify as an offense under § 879(a)(3).[23]

**[9]** Taking the two message board postings in the context of all of the relevant facts and circumstances, the prosecution failed to present sufficient evidence to establish beyond a reasonable doubt that Bagdasarian had the subjective intent to threaten a presidential candidate. For the same reasons that his statements fail to meet the subjective element of § 879, given any reasonable construction of the words in his postings, those statements do not constitute a "true threat," and they are therefore protected speech under the First Amendment. *See Black*, 538 U.S. at 359. Accordingly, his conviction must be reversed.

**REVERSED.**

---

WARDLAW, Circuit Judge, concurring in part, and dissenting in part:

I concur fully with the majority's analysis of the law of "true threats." The First Amendment prohibits the criminalization of pure speech unless the government proves that the speaker specifically intended to threaten. Thus, in every threats case the Constitution requires that the subjective test is met. *Virginia v. Black*, 538 U.S. 343 (2003). In this case, the statute at issue, 18 U.S.C. § 879(a)(3), also requires that a reasonable person would foresee that his statement would be

---

[23]*See supra* at 9810-11 n.18.

perceived as a threat to harm a presidential candidate. Because there is sufficient evidence supporting a finding of objective intent, *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and because even under the heightened standard of review that we apply to constitutional facts, *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1070 (9th Cir. 2002) (en banc), the subjective intent requirement is also met, I conclude there is sufficient evidence to find Mr. Bagdasarian guilty of threatening harm against then-presidential candidate Barack Obama.

## I.

In the wee hours of the morning of October 22, 2008, Mr. Bagdasarian, under the user name "californiaradial," joined a Yahoo! Finance — American International Group message board, an internet site on which members of the public could post messages concerning financial matters, AIG, and other hot topics of the day. Californiaradial's first posting about candidate Obama, at 1:00 a.m., was to the "thread" headed "re: Hamas, Hezbollah, Syria, and Iran favor Obama 100 to 0," where he said "blow up all the mother fkers, please carpet bomb the middle east . . . give me the switch, no prob, thump and poof sand niggar."[1] Two minutes later on the same thread he posted: "I would really lose no sleep if middle morons gone . . . nuke bombing . . . ." At 1:15 a.m., under another thread with the subject header "OBAMA," he posted the first of the two threats charged in the indictment: "fk the niggar, he will have a 50 cal in the head soon." Six minutes after that, Californiaradial combined his pro-bomb and anti-Obama rhetoric in another post on the "OBAMA" thread: "yea, the honest people have NO guns and the scum bags, niggars and drug fks do, thanx obombhaaaaa." He reiterated his racist animus on a thread referencing Obama's Irish heritage: "full monkey, hey can you crank the music box, I wanna see the puppet

---

[1] The posts appear here as they do in the record; because of their nature, "sic" designations are omitted.

monkey dance . . . ." Four minutes later, at 1:26 a.m. he added, "a lepraaaaaaniggggggggamuch? blank that one, yahoo a-holes." At 1:35 a.m., Californiaradial created his own anti-Obama thread, under the subject header "shoot the nig." There he posted the second threat charged in the indictment: "country fkd for another 4 years+, what nig has done ANY-THING right???? long term???? never in history, except sambos."

At this point, the other message board participants reacted to the serious nature of Californiaradial's threats. "Dan757x" immediately responded on the "shoot the nig" thread: "You've been reported by me, a good ole' white boy." "Freddie226" weighed in to support Dan, who next posted: "I hope everyone reports this type of garbage." Under the same thread, "Sniper1agent" posted: "Be advised Federal Law Enforcement is monitoring . . . ," and "Brown.romaine" advised: "I am reporting this post to the Secret Service." And, in fact, John Base, a retired Air Force officer who saw Californiaradial's "shoot the nig" message did report the threats to the Los Angeles Field Office of the United States Secret Service because, as set forth in the Stipulated Facts, he was "concerned that the posting threatened harm to Barack Obama."

In response, a Secret Service agent searched the message board, located the "shoot the nig" posting, and also discovered the "50 cal in the head" posting. From Yahoo!, the Secret Service obtained the IP address for the user registered as "californiaradial," and it used that information to get subscriber data from Cox Communications. This trail of bread crumbs led the Secret Service to La Mesa, California, and, on November 21, 2008, agents appeared at Californiaradial's doorstep.

They discovered that, in the real world, the user known as "californiaradial" in cyberspace was Mr. Bagdasarian. Mr. Bagdasarian admitted to posting the "fk the nig" and "50 cal

in the head" message from his home computer. When asked, he stated that he had weapons in his home. A search warrant executed a few days later revealed that Mr. Bagdasarian possessed six firearms, including a Remington model 700 ML .50 caliber muzzle-loading rifle. Agents also discovered .50 caliber ammunition in Mr. Bagdasarian's home. The agents searched Mr. Bagdasarian's computer, where they discovered a November 4, 2008, email message from Mr. Bagdasarian to an associate with the foreboding subject line "Re: And so it begins." The email stated, "Pistol??? Dude, Josh needs to get us one of these, just shoot the nigga's car and POOF!" The email then provided a link to a photograph of a rifle on a Barrett Rifles website. A second email that Mr. Bagdasarian sent the same day under the same subject line stated, "Pistol . . . plink plink plink Now when you use a 50 cal on a nigga car you get this." The email then directed the reader to a You-Tube video of a car being blown up.

## II.

"Whether a particular statement may properly be considered to be a threat is governed by an objective standard — whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *Planned Parenthood*, 290 F.3d at 1074 (quoting *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990)). "Alleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." *Orozco-Santillan*, 903 F.2d at 1265. "[C]ontext is critical in a true threats case and history can give meaning to the medium." *Planned Parenthood*, 290 F.3d at 1078. In determining whether Mr. Bagdasarian's statements constituted objective threats, we must look "at the entire factual context of those statements including: the surrounding events, the listeners' reaction, and whether the words are conditional." *United States v. Gordon*, 974 F.2d 1110, 1117 (9th Cir. 1992).

Reading the two statements charged in the indictment in isolation, the majority dissects them to conclude that they were not even threats. It fails to consider the ominous backdrop of America's history of racial violence, the uniquely racial and violent undercurrents of the 2008 presidential election, the entirety of Mr. Bagdasarian's postings on October 22, two weeks before the 2008 election, and the listeners who not only perceived the posts as threatening when they were made, but who acted on that perception.[2]

Mr. Bagdasarian's statements portended no less impending harm because they did not completely spell out the threat. For example, given this country's history of Ku Klux Klan violence, a burning cross can signify "a message of intimidation" and "the possibility of injury or death." *Black*, 538 U.S. at 357. Parking a Ryder truck outside an abortion clinic, after the Oklahoma City bombing, can indicate a serious intent to harm. *Planned Parenthood*, 290 F.3d at 1078-79. And, as the district court recognized, in the wake of September 11, telling a flight attendant that you are carrying a bomb is not a joke. Mr. Bagdasarian posted at a time when violent and racist threats against candidate Obama were being taken very seriously. Though President Obama currently resides in the White House, the prospect of his election ignited polarizing racial animus, including "racist chatter on white supremacist Web

---

[2]The majority also disregards the evidence presented at trial of our country's experience with political assassinations. The sheer number of presidents (nearly ten percent of the presidents who have served) who have been targeted and killed by assailants with guns in our nation's short history undermines the conclusion that a reasonable person would interpret Mr. Bagdasarian's "50 cal in the head" comment as a joke or mere political rhetoric. Moreover, as the recent example of the shooting of Arizona Representative Gabrielle Giffords demonstrates, what begins as a bizarre post on the Internet can erupt as a devastating outburst of violence. *See* Alexandra Berzon, John R. Emshwiller & Robert A. Guth, *Postings of a Troubled Mind*, Wall St. J., Jan. 12, 2011; Marc Lacey & David M. Herszenhorn, *Congresswoman Is Shot in Rampage Near Tucson*, N.Y. Times, Jan. 9, 2011.

sites." Nedra Pickler, *Racial Slur Triggers Early Protection for Obama*, Associated Press, May 4, 2007. Not only did this animus materialize in at least one viable assassination attempt, *see* Dave McKinney, Frank Main & Natasha Korecki, *A Plot Targeting Obama?*, Chi. Sun-Times, Aug. 26, 2008,[3] but the heightened fear that candidate Obama would be the target of violence spurred the Department of Homeland Security to authorize Secret Service protection as early as May 2007, before candidate Obama was even nominated for the presidency, making him the only presidential candidate to receive protection so early.[4] Pickler, *Racial Slur*.

Certainly as of fall 2008, our country's collective experience with internet threats and postings that presaged tragic events made it all the more likely that a reasonable person would foresee that even anonymous internet postings would be perceived as threats.[5] The country had witnessed the 1999 Columbine High School shootings by Dylan Klebold and Eric Harris, who had posted death threats on his website, along with discussions of bombmaking and killing students and teachers. *See* Michael Janofsky, *Parents Want New Inquiry into Columbine Killings*, N.Y. Times, Jan. 6, 2002; Kirk Johnson, *Columbine Evidence Is Placed on Chilling Public Display*, N.Y. Times, Feb. 27, 2004; Kim Murphy, *Warning*

---

[3]A similar plot planned on the internet by white supremacists involving a killing spree that would end with the assassination of candidate Obama was derailed by the arrest of two men who were charged with, among other things, making threats against a major presidential candidate. *See* Richard A. Serrano, *Pair Accused of Plotting to Kill Obama, 102 Blacks*, L.A. Times, Oct. 28, 2008. A Wisconsin man who threatened over the internet to kill President-elect Obama shortly before the inauguration for what he claimed was the "country's own good" was arrested in Mississippi. *Obama Threat Leads to Arrest*, L.A. Times, Jan. 17, 2009.

[4]Then-Senator Hillary Clinton received Secret Service protection throughout her candidacy due to her status as a former First Lady. Pickler, *Racial Slur*.

[5]The majority acknowledges that a speaker's anonymity can render a statement more threatening.

*Signs of Massacre Were Hidden in Plain Sight*, LA. Times, May 9, 1999. In 2005, days after an Orange County teenager posted on an Internet message board that he would "start a Terror Campaign to hurt those that have hurt me," the teen went on a neighborhood shooting spree, killing a man and his daughter. Kimi Yoshino, *Threats Online: Is There a Duty to Tell?*, L.A. Times, Nov. 2, 2005. Also in 2005, a teenager who was an "avid participant in Internet discussion groups . . . with postings under his name that mention weapons and violence amid broader conversations about politics, the paranormal, time travel, reincarnation and Big Foot" killed seven people and himself at his high school in Minnesota. Kirk Johnson, *Survivors of High School Rampage Left with Injuries and Many Questions*, N.Y. Times, Mar. 25, 2005.

And in 2007, following a disturbing online posting, a Virginia Tech student shot and killed thirty-two people on the campus. Benedict Carey, *For Rampage Killers, Familiar Descriptions, "Troubled" and "Loner," but No Profile*, N.Y. Times, Apr. 18, 2007. In the wake of this experience, it is only logical to conclude that on-line postings of impending violence would be perceived by reasonable people as serious threats. As one district attorney put it following yet another student's threat to shoot his classmates, "Any kid that makes a direct threat of this nature on the tail of what happened in Santee can reasonably expect there to be a very dramatic reaction." Ofelia Casillas, *Teen Pleads Not Guilty to Making Bomb Threat*, L.A. Times, Mar. 20, 2001.

In a similar case involving internet threats, a federal district judge in 2009 denied a motion filed by Harold Turner, a blogger and internet radio host, seeking to dismiss an indictment against him for threatening three judges of the United States Court of Appeals for the Seventh Circuit. On his blog, Turner had posted information about the judges, and had written: "Let me be the first to say this plainly: These judges deserve to be killed. Their blood will replenish the tree of liberty. A small price to pay to assure freedom for millions." David Kra-

vets, *Blogger Threatened to Murder Judges, Feds Say*, Wired, June 24, 2009. The district court found that the fact that Turner, who lived in New Jersey, posted threats against Chicago-based judges did not diminish the threat, reasoning:

> In an era when physicians have been murdered in their places of worship; families of Judges have been slain; a Judge of the Eleventh Circuit Court of Appeals and State Court Judges have been blown up or shot; a Federal Courthouse ripped apart by home-made explosives, all in the name of political dissent or religious fanaticism, it cannot be said that Defendant's statements are unlikely to incite imminent lawless action.

*United States v. Turner*, 2009 WL 726501, at *3 (E.D.N.Y. 2009). As the majority points out, Turner was subsequently convicted.

The majority does not dispute that Mr. Bagdasarian's statements were nonconditional,[6] alarming, and dangerous, but finds their threatening nature blunted by the fact that Mr. Bagdasarian posted them on a financial "non-violent" message board. Although the message board itself focused on AIG's 2008 financial meltdown, the individuals who posted naturally veered into the political implications of the crashing

---

[6]The majority cites *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam), for the proposition that we must interpret Bagdasarian's statements in light of our national commitment to free and open political debate. While this principle is undoubtedly correct, *Watts* itself is inapposite. *Black*'s subjective intent requirement prevents free and open public debate from being swept up in the prohibition of "true threats." In *Watts*, however, the Supreme Court examined the defendant's statement under the objective standard and concluded that the statement at issue would not be perceived as a threat because the statement was "expressly conditional," rather than immediate. *Id.* Thus, not only does *Watts* fail to support the majority's assertion that Bagdasarian's meaning was "plain," it lends further support to my view of the objectively threatening nature of Bagdasarian's postings, which were not conditional.

financial markets.[7] Mr. Bagdasarian's own postings on the board contained increasingly political, violent, and vicious attacks targeting candidate Obama. That he posted on a financial message board does not diminish the nature of the threats; just as they would be no less diminished had he shouted them on the floor of the New York Stock Exchange.

The majority focuses narrowly on the charged threats and dismisses them as mere imperatives or predictions. But our case law is to the contrary. We do not require that the speaker in a threats case explicitly threaten that he himself is going to injure or kill the intended victim; rather, we examine the surrounding circumstances to determine whether a reasonable person in the speaker's shoes would foresee that his statements would be perceived as threats.

For example, in *United States v. Hanna*, 293 F.3d 1080, 1082-83 (9th Cir. 2002), we determined that there was sufficient evidence for a jury to conclude that Hanna had threatened the President,[8] where no explicit threat had been made. Rather, the documents underlying the charges merely depicted President Clinton along with statements such as "KILL THE BEAST," "666," "willie jeffer jackal," and "WANTED FOR MURDER, DEAD OR ALIVE." We held that: "Although Hanna did not explicitly indicate that *he* was going to kill the President, a jury could conclude that a reasonable person in Hanna's position would foresee that such statements would be

---

[7]A thread headed "re: Nobodys Watchin the Store in America" emerged on which "Sheeeyaright" posted "its up to us.No Obama." There ensued a colorful discussion about how the economic situation had changed during the administrations of President Clinton and President Bush, and what might be expected from a President Obama. This led to still other threads not started by Mr. Bagdasarian entitled "Obama will make the US a 3rd world Country" and "Hamas, Hezbollah, Syria, and Iran favor Obama 100 to 0."

[8]In *Hanna*, we reversed the conviction only due to other trial errors which indicated that the jury's deliberations may have been tainted by improperly admitted evidence.

perceived as threats by the recipients of the statements." *Id.* at 1088.

Similarly, in *United States v. Romo*, 413 F.3d 1044, 1051 (9th Cir. 2005), an opinion relied upon by the district court, we upheld a threats conviction where then-incarcerated Romo "wrote and mailed a letter stating that someone should put a bullet in the President's head and that he would like to do it." We found this to be an "unequivocal" threat, stating that a "clearer threat is difficult to imagine." *Id.* at 1050, 1051. And, in *Planned Parenthood*, anti-abortion activists circulated on the internet and elsewhere a series of "WANTED" and "GUILTY" posters identifying doctors who performed abortions, and who were thereafter murdered, along with a "Nuremberg Files" poster where lines were drawn through the names of the murdered physicians. Although the posters did not contain an explicit threat of harm, it was proper to consider them in context. *Planned Parenthood*, 290 F.3d at 1064-65. We concluded substantial evidence supported convictions under the FACE Act,[9] in that the anti-abortionist group "was aware that a 'wanted'-type poster would likely be interpreted as a serious threat of death or bodily harm by a doctor in the reproductive health services community who was identified on one, given the previous pattern of 'WANTED' posters identifying a specific physician followed by that physician's murder." *Id.* at 1063. We were "independently satisfied" that the posters "amounted to a true threat" and were not protected speech.[10] *Id.*

---

[9]The Freedom of Access to Clinic Entrances Act ("FACE") makes it a crime when a person "by force or threat of force . . . intentionally injures, intimidates or interferes with . . . any person because that person is or has been . . . obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1).

[10]That *Hanna* and *Romo* do not deal with *Black*'s subjective intent requirement does not discount the persuasiveness of the objective intent analysis in those cases. *Black* clarified that the subjective test governs whether a statement constitutes a "true threat"; it did not disturb how we

Most telling were the contemporaneous reactions of the recipients of Mr. Bagdasarian's posted threats.[11] At least four individuals indicated that they perceived "shoot the nig" as a threat to candidate Obama, and the threat was in fact reported to the United States Secret Service, which then launched into action to prevent the threat from materializing. There can be no doubt that "construing the evidence in the light most favorable to the prosecution," *Nevils*, 598 F.3d at 1166 (citing *Jackson*, 443 U.S. at 319), there was sufficient evidence for "a rational juror" to find objective intent. *Id.*

---

have applied the objective test. Thus, the holdings of *Hanna* and *Romo*, analyzing the threats under the objective standard and concluding it was satisfied where the speakers "stated or at least suggested that the President should be killed," remain controlling authority as to the objective standard. *Hanna*, 293 F.3d at 1088. We reversed the conviction in *Hanna* only because of certain improperly admitted evidence which may have tainted the jury's deliberations. Therefore, this reversal does not detract from *Hanna*'s holding that the suggested threat to the President met the objective standard. Nor does the fact that *Romo* declined to address whether Romo's speech constituted a "true threat" bear any relevance to this discussion. As the majority itself reiterates, when First Amendment issues are raised, the *subjective intent* standard must be applied to determine whether the speech is a "true threat" that may be constitutionally criminalized. *Romo*'s *objective test* analysis is pertinent here, and it remains good law. *See Romo*, 413 F.3d at 1051-52.

[11]The majority is correct that none of the other message board participants used the word "threat" in reaction to Bagdasarian's postings, but that they perceived a threat to candidate Obama is made obvious by their postings that the threats had been "reported" and their references to "Federal Law Enforcement" and the "Secret Service." The majority then erroneously relies on its own speculation to conjure up other possible reasons for the readers' reactions. Even if the comments did support the inferences suggested by the majority, however, the trial court made a finding that the readers' comments confirmed that Bagdasarian's postings were objectively perceived as threats, and we "must defer to that resolution." *See United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) ("[W]hen 'faced with a record of historical facts that supports conflicting inferences' a reviewing court 'must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " (quoting *Jackson*, 443 U.S. at 326)).

**III.**

Although it is a closer question, as questions of subjective intent generally are, after independently reviewing the record, I believe the district court did not err in finding that Mr. Bagdasarian subjectively intended to threaten presidential candidate Obama. To prove subjective intent, the government must show that "the speaker means to communicate a serious expression of an intent to commit an unlawful act of violence." *Black*, 538 U.S. at 359. The government need not prove that Mr. Bagdasarian "himself will kill" candidate Obama, but need demonstrate only the intent to threaten. "The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats 'protects individuals from the fear of violence,' . . . in addition to protecting people 'from the possibility that the threatened violence will occur.' " *Id.* at 360 (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)).

In a night of posting on the AIG board, Mr. Bagdasarian made numerous explosive comments aimed at candidate Obama. Although only two of his posts were charged as threats, they, together with his other posts, indicate that he intended to threaten. Others on the message board posted comments that could be described as political rhetoric, but it was Mr. Bagdasarian alone who introduced the posts tinged with violence and racism toward Obama and it was Mr. Bagdasarian alone who took the affirmative step of introducing the ominous thread headed "shoot the nig," against which the other board participants reacted so strongly. And at the very time that Mr. Bagdasarian posted "fk the niggar, he will have a 50 cal in the head soon," he possessed in his home a Remington model 700 ML .50 caliber muzzle-loading rifle and .50 caliber ammunition with which to load it. *See United States v. Sutcliffe*, 505 F.3d 944, 959 (9th Cir. 2007) (concluding that possession of a weapon is evidence of subjective intent to threaten where the threat involves the infliction of harm).

As the district court found, Mr. Bagdasarian's posts were not casual one-off comments. When other participants confronted him with the gravity of starting a thread labeled "shoot the nig" by indicating they were reporting him and that law enforcement was monitoring him, he evidenced his own belief that his posts were threatening. First, he wanted to know "which [law enforcement] agency" was monitoring the message board. Then he began to make excuses for his threatening comments, posting: "Listen up, crybaby ole white boy, I was drunk."

Mr. Bagdasarian had imbibed some alcohol that night, but it did not prevent him from tracking the conversations occurring on multiple threads and posting responses over a seven-hour period. Moreover, his postings that night were specific, relevant to the context of each thread and even included wordplay. If anything, his intake of "vino," as he described it, may have lowered his inhibitions sufficiently that he was in fact posting his genuinely held views about Obama, including a true expression of his intent to threaten the candidate with harm. As the district court found, that Mr. Bagdasarian was drinking does not make his statements any less threatening than they were at the time he made them, and his 8:00 a.m. posting that he was drunk when he started the "shoot the nig" thread at 1:35 a.m. that morning only indicates that he woke up to realize the serious nature of his threats.

And Mr. Bagdasarian's continuing threats of harm to President-elect Obama two weeks later, when he was presumably sober, further evidence his intent to threaten. He sent two emails on Election Day headed: "And so it begins." The first, which provided a link to the "www.barrettrifles.com" website depicting a Barrett model 82a1 rifle, stated: "Josh needs to get us one of these, just shoot the nigga's car and POOF!" The second provided a link to a YouTube video showing a car being blown up. That email stated: "Pistol . . . plink plink plink Now when you use a 50 cal on a nigga car you get this."

The evidence demonstrates that Mr. Bagdasarian, an adult man who knowingly possessed a .50 caliber rifle, intentionally posted on the "OBAMA" thread: "fk the niggar, he will have a 50 cal in the head soon," understanding he had access to that very weapon and could implement the threat. Only twenty minutes later he initiated the "shoot the nig" thread, under which he wrote "country fkd for another four years+, what nig has done ANYTHING right???? long term???? never in history, except sambos." That Mr. Bagdasarian later made a public apology does not detract from his intent at the time; his intent to threaten harm to candidate Obama generated fear for the candidate's safety and mobilized the Secret Service, which tracked Mr. Bagdasarian down. Mr. Bagdasarian did not come forward; the Secret Service had to locate him. He hid behind his "californiaradial" cloak of anonymity with the hope, one can infer, that he would not be found out. Therefore, independently reviewing the entire record, I conclude that at the time Mr. Bagdasarian made the charged threats, he acted with the specific intent to threaten candidate Obama.

## IV.

The prohibition on true threats "protects individuals from the fear of violence and from the disruption that fear engenders." *Black*, 538 U.S. at 360 (citation and internal quotation marks omitted). Undoubtedly, the need for protection takes on exceptional importance in the context of a presidential candidacy. *See Watts*, 394 U.S. at 707 (discussing threats against the president); *Roy v. United States*, 416 F.2d 874, 877 (9th Cir. 1969) ("Thus, it appears that the statute [prohibiting threats against the President] was designed in part to prevent an evil other than assaults upon the President or incitement to assault the President. It is our view that the other evil is the detrimental effect upon Presidential activity and movement that may result simply from a threat upon the President's life."). Not only could the fear engendered by true threats limit a candidate's freedom to participate fully in the debate

leading up to the election — thus depriving the campaign process of its valuable public function, *see Buckley v. Valeo*, 424 U.S. 1, 66-67 (1976) (per curiam) — but the failure to take such threats seriously could ultimately deprive our country of a public servant and potential leader. Because the evidence presented at trial as to objective intent is more than sufficient to allow at least one rational trier of fact to find that Mr. Bagdasarian's statements were threats in violation of § 879(a)(3), and because an independent review convinces me that the constitutional requirement of subjective intent is met, I would affirm Mr. Bagdasarian's conviction.